170 F.3d 1200
 43 Fed.R.Serv.3d 930, 99 Cal. Daily Op. Serv. 2018,
99 Cal. Daily Op. Serv. 4287,
1999 Daily Journal D.A.R. 2633,
1999 Daily Journal D.A.R. 5473
 389 ORANGE STREET PARTNERS, a Connecticut Partnership,
Defendant Cross-Claimant Appellee,
and
Clifford Robinson, Defendant-X-Claim Third-Party Plaintiff Appellant,
v.
Richard L. ARNOLD; Kyle Arnold; Regis Conlon, Third-party
Defendant Cross-Claimants Appellees.
and
Trail Blazers Inc., an Oregon Corporation, Plaintiff-Cross
Defendant-Appellee,
v.
Sebastian S. Ciarcia, and Law Office of Sebastian Ciarcia, a
Connecticut Corporation, Third-Party Defendant Appellee.
Clifford Robinson, Defendant Cross-Claimant Third-Party
Plaintiff Appellant,
v.
Sebastian S. Ciarcia, and Law Office of Sebastian Ciarcia, a
Connecticut Corporation, Richard L. Arnold; Kyle
Arnold; Regis Conlon, Third-Party
Defendants Cross-Claimants Appellees.
Trail Blazers Inc., an Oregon Corporation, Plaintiff-Cross Defendant,
and
389 Orange Street Partners, Defendant-Cross Claimant.
Trail Blazers Inc., an Oregon Corporation, Plaintiff,
v.
389 Orange Street Partners, a Connecticut Partnership,
Defendant-Cross Claimant Appellee.
and
Clifford Robinson, Defendant Cross-Claimant Third-Party
Plaintiff Appellant,
v.
Sebastian S. Ciarcia, and Law Office of Sebastian Ciarcia, a
Connecticut Corporation, Richard L. Arnold; Kyle
Arnold; Regis Conlon, Third-Party
Defendants Appellees.
 Nos. 97-35877, 98-35005 and 98-35240.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 3, 1998.
Decided March 22, 1999.*
 
 John Clinton Geil, Geil & Clark, P.C., Portland, Oregon, for defendant cross-claim third-party plaintiff-appellant Clifford Robinson.
 Steven M. Rose, Rose, Senders and Bovarnick, Portland, Oregon, for defendant cross-claimant appellee 389 Orange Street Partners.
 Sebastian S. Ciarcia (In Pro Per), Law Office of Sebastian Ciarcia, a Connecticut Corporation, Meriden, Connecticut, for third-party defendants cross-claimants appellees Sebastian S. Ciarcia, Richard L. Arnold, Kyle Arnold and Regis Conlon.
 Appeals from the United States District Court for the District of Oregon; Malcolm B. Marsh, District Judge, Presiding. D.C. No. CV-96-01010-MFM.
 Before: NOONAN, THOMPSON, and TROTT, Circuit Judges.
 Opinion by Judge TROTT; Dissent by Judge NOONAN.
 TROTT, Circuit Judge:
 
 
 1
 * Overview
 
 
 2
 Clifford Robinson appeals three final judgments of the District of Oregon in favor of cross-claim defendants Orange Street Partners ("OSP"), Regis Conlon, Sebastian Ciarcia, and Richard and Kyle Arnold (collectively, "Appellees"). The action originated as an interpleader action brought by Trailblazers, Inc. against Robinson and OSP to determine the appropriate recipient of wages earned by Robinson. Robinson brought several cross-claims against Appellees. The first judgment awarded the wages to OSP under a promissory note and security agreement and dismissed Robinson's claims against all but Ciarcia as time-barred. The second judgment granted attorneys' fees to OSP. The third judgment dismissed Robinson's claims against Ciarcia as time-barred. We have jurisdiction under 28 U.S.C. § 1291 (1994), and we affirm in all respects.
 
 II
 Background
 
 3
 Acting through his then-agent, Larry Gillman, Robinson built a home in Connecticut at a total cost of approximately $1,500,000. Under a power of attorney, Gillman obtained initial financing on Robinson's behalf from Shawmut Mortgage Co. and Berkshire Bank, which was later replaced by a loan from Sears Mortgage Co. in the amount of $1,125,000. Ciarcia was responsible for disbursing the Sears funds at Gillman's direction. Gillman obtained additional financing from Stillwater Pond Partners. OSP, a partnership of the Arnolds, Conlon, Ciarcia, Stillwater, and several non-parties, also made a loan to Robinson, and the loan from Stillwater was "rolled over" into the loan from OSP, for a debt to OSP of $468,000. OSP disbursed these funds at Gillman's direction.
 
 
 4
 Robinson signed a promissory note for the OSP loan in Connecticut on June 25, 1993, when his house purchase closed. At the same time, Robinson executed an "Assignment of Security and Security Agreement" to OSP, assigning his wages from Trailblazers to OSP in the event of default on the promissory note. Robinson then signed a letter to Trailblazers, placing the organization on notice of the assignment and instructing that his wages be paid to OSP on demand.
 
 
 5
 Following the terms of the promissory note, Robinson made thirty-five monthly interest payments between June, 1993, and May, 1996. The principal was due in a balloon payment on May 26, 1996, which Robinson failed to make. OSP demanded the full amount of the principal plus a penalty of $23,269.16, for a total demand of $488,269.16, from Trailblazers. Trailblazers brought the instant interpleader action against Robinson and OSP.
 
 
 6
 With respect to the OSP loan, Robinson brought cross-claims of breach of fiduciary duty, negligence, conversion, fraud, and breach of contract against OSP and Ciarcia. With respect to the Sears loan, Robinson brought cross-claims of breach of trust, quasi contract, legal malpractice, negligent misrepresentation, and deceit against Ciarcia. Robinson also alleged that the Arnolds and Conlon were jointly and severally liable for OSP's and Ciarcia's breaches of contract and liable under agency law principles for OSP's and Ciarcia's potential liabilities to Robinson. Robinson filed his claims on August 8, 1996, more than three years after the loans closed. OSP cross-claimed against Robinson for payment on the promissory note.
 
 
 7
 The district court granted summary judgment to OSP on its contract claim, awarding $517,734.02 for late fees, prejudgment interest, and principal, and awarded attorneys' fees to OSP under a provision in the promissory note. The court granted summary judgment to Appellees on the claims arising from the OSP loan and summary judgment to Ciarcia on the claims arising from the Sears loan, holding all of these claims barred by both the Connecticut and the Oregon statutes of limitation. Robinson moved for reconsideration of summary judgment. The district court denied the motion.
 
 III
 Standard of Review
 
 8
 This court reviews the district court's grant of summary judgment de novo. Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998). Viewing the evidence in the light most favorable to Robinson, we must determine whether any genuine issues of material fact remain and whether the district court correctly applied the relevant substantive law. See id.
 
 
 9
 We review a district court's refusal to grant a motion for reconsideration of summary judgment under Federal Rule of Civil Procedure 59(e) for an abuse of discretion. Bellus v. United States, 125 F.3d 821, 822 (9th Cir.1997). We review the district court's award of attorneys' fees made pursuant to state law for an abuse of discretion. St. Paul Fire & Marine Ins. Co. v. F.H., 117 F.3d 435, 439 (9th Cir.1997), overruled on other gnds., Government Employees Ins. Co. v. Dizol, 133 F.3d 1220, 1227 (9th Cir.1998) (en banc).
 
 IV
 
 10
 Summary Judgment on Robinson's Cross-Claims
 
 
 11
 Connecticut and Oregon law provide materially different results when the statutes of limitation are applied to Robinson's cross-claims against Appellees. In order to review the district court's summary judgment on statute of limitation grounds, we first must decide what law supplies the statute of limitation for these claims. We hold that Connecticut law applies, and that under Connecticut law the district court correctly held that Robinson's claims were time-barred.[1]
 
 
 12
 * Which State's Law Applies
 
 
 13
 When a federal court sitting in diversity hears state law claims, the conflicts laws of the forum state are used to determine which state's substantive law applies. Alaska Airlines, Inc. v. United Airlines, Inc., 902 F.2d 1400, 1402 (9th Cir.1990) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Under Oregon law, the statute of limitation is provided by the state which supplies the substantive law. Or.Rev.Stat. § 12.430(1)(b) (1997).
 
 
 14
 Oregon courts follow the Restatement (Second) of Conflict of Laws § 145 (1971) approach to determining the appropriate substantive law. Casey v. Manson Const. & Eng'g Co., 247 Or. 274, 428 P.2d 898, 900 (Or.1967) (adopting the approach in the tentative draft to the Restatement, which later became § 145). The Restatement focuses on the place where the injury occurred, the place where the conduct occurred, the domicil, nationality, place of incorporation and place of business of the parties, and the place where the relationship between the parties is centered. Id. Comparable factors are applied when an Oregon court considers the appropriate law for a claim of misrepresentation. Western Energy, Inc. v. Georgia-Pacific Corp., 55 Or.App. 138, 637 P.2d 223, 228-29 (Or.Ct.App.1981) (citing the Restatement § 148).
 
 
 15
 In the instant case, the alleged tortious conduct occurred in Connecticut. Most of the Appellees are residents of Connecticut. The relationship between Robinson and Appellees is centered at the house in Connecticut. OSP is a Connecticut partnership. The only factor favoring Oregon substantive law is Robinson's residence in Oregon. Applying the factors specific to a claim of misrepresentation yields the same result. Robinson signed the allegedly fraudulent documents in Connecticut, and the alleged misrepresentations were contained in the documents. Robinson was supposed to render performance under the promissory note by paying money to the Connecticut defendants. The Restatement factors militate in favor of applying Connecticut substantive law and, therefore, the Connecticut statutes of limitation.
 
 B
 Connecticut Statutes of Limitation
 
 16
 Robinson's cross-claims were time-barred under Connecticut's statutes of limitation. The statute for negligence actions provides for two years with a discovery rule, not to exceed three years from the date of the act or omission. Conn. Gen.Stat. § 52-584 (1997); McDonald v. Haynes Med. Lab., Inc., 192 Conn. 327, 471 A.2d 646, 650 (Conn.1984). For all other tort actions, a plaintiff must file suit within three years of the act or omission, regardless of the time of actual or constructive discovery of the cause of action. Conn. Gen.Stat. § 52-577 (1997).
 
 
 17
 All of the acts and omissions which Robinson alleges occurred on or before June 25, 1993, the date of closing the purchase of Robinson's house. Robinson filed his cross-claims on August 8, 1996, more than three years later. Both Connecticut's negligence and general tort statutes of limitation had run unless Robinson can establish an exception.
 
 C
 Fraudulent Concealment Exception
 
 18
 Robinson argues that Appellees fraudulently concealed his causes of action. Fraudulent concealment, if affirmatively pleaded and proved by the party seeking to avoid the statute of limitation, can toll the Connecticut statutes of limitation until the party subjectively discovers the cause of action. Conn. Gen.Stat. § 52-595 (1997); Beckenstein v. Potter & Carrier, Inc., 191 Conn. 150, 464 A.2d 18, 25 (Conn.1983) ("In order to raise a claim of fraudulent concealment, the party challenging a statute of limitations defense must affirmatively plead it."). Because the Federal Rules of Civil Procedure govern pleading in diversity cases, Robinson must have stated "the circumstances constituting fraud ... with particularity." Moore v. Brewster, 96 F.3d 1240, 1245 (9th Cir.1996) (citing Fed.R.Civ.P. 9(b)).
 
 
 19
 Fraudulent concealment under Connecticut law requires that Robinson plead and prove three elements: (1) Appellees were aware of the facts necessary to establish the cause of action; (2) Appellees intentionally concealed these facts from Robinson; and (3) Appellees' concealment of the facts was for the purpose of obtaining delay in Robinson's filing the complaint. See Bartone v. Robert L. Day Co., 232 Conn. 527, 656 A.2d 221, 224-25 (Conn.1995).
 
 
 20
 We have searched the record from the district court and are unable to ascertain any allegation of fraudulent concealment as required by Connecticut law.[2] In his cross-claim, Robinson alleged:
 
 
 21
 Robinson was not aware of these acts and failures to act. Robinson justifiably relied on [the defendants'] failure to inform him of these material facts as an affirmative representation that no improper uses of Robinson's funds was [sic] occurring. Robinson relied at all times material hereto on [the defendants'] express or implied representations that [they were] acting in Robinson's best interests. Had Robinson known the truth, he would have taken steps both to stop further inappropriate actions and to seek relief for the losses he was suffering.
 
 
 22
 Cross-Claim pp 55, 95. Robinson also alleged with regard to his fraud claim against Ciarcia: "Ciarcia intentionally concealed these matters so that Robinson would not know the truth of this scheme and thereby deprive Ciarcia of legal fees and Ciarcia's other client OSP of a huge interest income stream," and with regard to his fraud claim against OSP: "OSP's failures to accurately account to Robinson for its disbursements were designed to conceal the scheme." Cross-Claim pp 53, 90. Robinson did not allege with particularity any fraudulent activity that was "directed to the very point of obtaining the delay of which he afterward seeks to take advantage by pleading the statute," as Connecticut law requires. Connell v. Colwell, 214 Conn. 242, 571 A.2d 116, 121 (Conn.1990).
 
 
 23
 The statutes of limitation issues were not a surprise to Robinson. OSP, Conlon, and the Arnolds pleaded the defense in their amended answer. They continued to assert the defense in the joint pretrial order and in two motions for summary judgment. Ciarcia asserted the defense in the joint pretrial order and in his motion for summary judgment.[3] At a hearing on Robinson's motion for leave to amend his complaint, the district court stated that it had "particular concerns in the area of the statute of limitations." The district court later granted leave to amend the complaint, and Robinson added a new cause of action. Robinson had ample opportunity to amend his complaint to better allege fraudulent concealment and failed to do so.
 
 
 24
 Furthermore, Robinson did not place evidence on the record creating a genuine issue of material fact supporting arguments that the Appellees sought to obtain delay in the filing of his complaint. Connecticut requires proof of fraudulent concealment by "the more exacting standard of clear, precise, and unequivocal evidence." Bartone, 656 A.2d at 224. In Connell, 571 A.2d at 121, where the plaintiff failed to present facts showing that the defendant's actions were "directed to the very point of obtaining the delay of which he afterward seeks to take advantage by pleading the statute," summary judgment for the defendant on the issue of fraudulent concealment was appropriate.
 
 
 25
 Robinson's arguments regarding fraudulent concealment were merely vague claims that Appellees did not respond at Robinson's request with information and therefore were not adequate to defeat summary judgment. Before Robinson filed his response to OSP's, the Arnolds', and Conlon's motion for summary judgment, the district judge warned: "I want you to clearly put your best foot forward on the statute[s] of limitation[ ] question." Robinson's response asserted: "OSP's role in the scheme was not known because the principals of OSP (attorney Ciarcia and accountant Conlon) were not providing information to Robinson whereby he could discover their misuse and mismanagement of his funds." Even after the district court's admonition, Robinson failed to make arguments comporting with Connecticut's law of fraudulent concealment.
 
 D
 Redesignation of Cross-Claims
 
 26
 Robinson argues on appeal that his cross-claims should be designated as affirmative defenses to his liability on the promissory note, such that the expiration of the Connecticut statutes of limitation is irrelevant. Because Robinson's liability on the promissory note is only to OSP, only Robinson's claims of breach of fiduciary duty, negligence, conversion, and fraud against OSP could qualify as affirmative defenses. Robinson failed to present this redesignation argument to the district court in a timely manner, and we hold that the district court did not abuse its discretion in failing to redesignate Robinson's claims.
 
 
 27
 Federal Rule of Civil Procedure 8(c) requires a district court to treat a claim that was misdesignated as a counterclaim as an affirmative defense if "justice so requires." Caselaw does not interpret the phrase "justice so requires," but we have held that a district court's decisions with regard to the treatment of affirmative defenses is reviewed for an abuse of discretion. See Federal Sav. & Loan Ins. Corp. v. Gemini Mgmt., 921 F.2d 241, 243-44 (9th Cir.1990) (district court's decision to strike affirmative defenses under Rule 12(f)).
 
 
 28
 Robinson currently contends that he sought three times during the proceedings below to have his claims redesignated. First, Robinson's concise statement of material facts in opposition to summary judgment contains language which could be interpreted as raising defenses of misrepresentation and failure of consideration to Robinson's liability on the promissory note. Second, the joint pretrial order discussed Robinson's cross-claims as affirmative defenses. Third, Robinson argued in his motion for reconsideration of summary judgment that the claims should have been treated as affirmative defenses.
 
 
 29
 The concise statement of material facts opposing summary judgment was an inadequate means of presenting the redesignation argument to the district court. Robinson stated that he "opposes the enforcement [of the promissory note] based on lack of consideration and misrepresentations made concerning the substance of the purported debt." The legal memorandum in opposition says nothing about the cross-claims qualifying as affirmative defenses. Furthermore, Robinson's counsel did not point to the concise statement of material facts as a treatment of the cross-claim as an affirmative defense until oral argument on this appeal. If Robinson's attorneys did not discover this argument until now, the district court should not be expected to have done so for them. We cannot say that "justice require[d]" the district court to interpret Robinson's concise statement of material facts as a request for redesignation.
 
 
 30
 Raising the claims as affirmative defenses in the joint pretrial order was inadequate. Nothing on the record indicates that the district court ever reviewed the joint pretrial order. The court did not sign the joint pretrial order. The pretrial conference was scheduled for July 16, 1997, and summary judgment was granted July 11, 1997. Counsel admitted at oral argument that the joint pretrial order did not reach the district court until after summary judgment had been granted. We are left with the conclusion that Robinson did not present this argument to the district court before the district court granted summary judgment in OSP's favor.
 
 
 31
 Raising the argument that the cross-claims should have been redesignated as affirmative defenses in his motion for reconsideration was simply too little, too late. Under Rule 59(e), a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law. School Dist. No. 1J v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir.1993). Robinson was required to establish that the district court committed clear error in failing to redesignate the claims before summary judgment in order to present a viable Rule 59(e) motion. Without establishing that he presented the Rule 8(c) argument to the district court before summary judgment, Robinson cannot point to clear error on the part of the district court in failing to redesignate the claims. Our abuse of discretion review precludes reversing the district court for declining to address an issue raised for the first time in a motion for reconsideration. See Bellus, 125 F.3d at 822.
 
 
 32
 Our holding that the district court acted within its discretion in failing to redesignate the claims should not be interpreted to impose an onerous burden on litigants or strip Rule 8(c) of meaning. All Robinson was required to do was present some timely legal argument to the district court that his mistakenly designated cross-claims were actually affirmative defenses to his liability on the OSP promissory note. In all of the pleadings, motions, and memoranda filed with the district court leading up to summary judgment, Robinson failed to do so.[4]
 
 E
 Failure to Consider Additional Claims
 
 33
 Robinson argues that he brought additional claims of breach of express and implied trust against OSP and Ciarcia, and the district court did not address those claims in its summary judgment. However, Robinson's only mention of these claims before the district court was in his memorandum opposing summary judgment. The claims were also raised in the joint pretrial orders, but, again, these joint pretrial orders were not before the district court before summary judgment was granted. When Robinson amended his complaint, he did not add the breach of trust claims. Because Robinson never pleaded breach of express and implied trust, the district court did not err in failing to consider them. See Insurance Co. of N. Am. v. Moore, 783 F.2d 1326, 1328 (9th Cir.1986) (holding that the district court did not commit error by refusing to award relief on an unpleaded cause of action).
 
 V
 
 34
 Robinson's Liability on the Promissory Note
 
 
 35
 The district court did not err in granting summary judgment to OSP on the issue of Robinson's liability on the promissory note. Connecticut law recognizes the enforceability of promissory notes as simple contracts. Appliances, Inc. v. Yost, 181 Conn. 207, 435 A.2d 1, 2 (Conn.1980). Undisputed evidence supports the finding that Robinson obligated himself on the note at the closing on June 25, 1993. Robinson does not contest on appeal that he signed a promissory note for the loan from OSP.
 
 
 36
 Robinson argues on appeal that the loan document, wage assignment, and security interest documents presented by OSP are not authentic. He correctly points out that the documents were apparently misdated and borrowed from a different transaction for use in this particular loan. In so arguing, Robinson does not maintain that he is not obligated on the loan in the amount that the district court awarded or that he did not execute a wage assignment and security agreement. Further, Robinson did not argue lack of authenticity of the loan document or security interest documents before the district court, and the argument is not appropriate for the first time on appeal. See Brannan v. United Student Aid Funds, Inc., 94 F.3d 1260, 1266 (9th Cir.1996). Robinson only argued the lack of authenticity of the wage assignment in the motion for reconsideration, but this new argument did not provide proper reason for the district court to reconsider its grant of summary judgment. See ACandS, 5 F.3d at 1263.
 
 VI
 Attorneys' Fees
 
 37
 The district court properly awarded attorneys' fees to OSP for the litigation over Robinson's liability on the promissory note. The note contains an attorneys' fees provision, which is enforceable under Connecticut law. See Sivilla v. Philips Med. Sys., 46 Conn.App. 699, 700 A.2d 1179, 1185 (Conn.App.Ct.1997). Although Robinson appealed the attorneys' fees award, he did not brief the issue. Because we affirm the district court on the issue of Robinson's liability to OSP, we affirm the award of attorneys' fees.VII
 
 Conclusion
 
 38
 Following the foregoing, we affirm the district court's grant of summary judgment to OSP on the issue of Robinson's liability on the promissory note. We affirm the district court's summary judgment in Appellees' favor on Robinson's tort claims arising out of the OSP loan transaction. Finally, we affirm the district court's award of attorneys' fees to OSP.
 
 
 39
 AFFIRMED.
 
 NOONAN, Circuit Judge, dissenting:
 
 40
 Summary judgment is a useful tool for federal trial courts, but summary judgment is abused when in determining disputed facts it becomes a substitute for trial by jury. The abuse is abetted when an appellate court chooses to overlook the clash of facts present in the trial record. Summary judgment for the defendants in this case is contrary to the standards established by the Supreme Court for summary judgment, contrary to the Federal Rules of Civil Procedure, and contrary to the requirements of justice.
 
 
 41
 Clifford Robinson, a star basketball player for the Portland Trailblazers, was swindled by his sports agent, Larry Gillman. The swindling occurred in Gillman's supervision of the construction in Connecticut of a house for Robinson. This fraud, undisputed in this case, is tied to the fraud that Robinson contends was committed by 389 Orange Street Partners (OSP) and the individual defendants.
 
 
 42
 It will be helpful to sort out two types of facts--those facts undisputed on the record in this case and facts which might be disputed if the case were tried but now have the status of facts that a rational juror could infer from the undisputed facts.
 
 UNDISPUTED FACTS
 
 43
 OSP was an ad hoc creation, brought into existence sometime between May 19, 1993 and June 24, 1993 for the purpose of refinancing the construction costs of Robinson's house. The general partners of OSP were Richard L. Arnold, Kyle Arnold, J. Regis Conlon, Francis Conlon, Francis Conlon II, Storm and Robert Kuchta, and Stillwater Pond Partners. The significance of Stillwater Pond Partners' share in OSP will be stated later. The attorney for OSP in making the loan to Robinson was Sebastian S. Ciarcia.
 
 
 44
 On June 25, 1993 OSP loaned Robinson $468,000 to refinance the construction. The term was three years, the rate of interest was 10.875%, and the security was a second mortgage on the property and the assignment of Robinson's wages as a basketball player. None of the lenders knew Robinson personally, and Gillman dealt only with Kyle Arnold. As Gillman put it, "It was Arnold's pool."
 
 
 45
 Under the headings of "Loan Brokerage Fees" and "Origination Fees," 5.5% of the OSP loan or $25,740 was paid immediately to Kyle Arnold. An additional $234,756 was listed as "Payoff to 369[sic] Orange St. Partners," that is, OSP itself. The "Payoff" was for a loan to Robinson made a month earlier, on May 18, 1993. This loan was from "Conlon and Arnold Partners." It was in the amount of $250,000, payable July 3, 1993, at the rate of 12%, and secured by a second mortgage of the property and the assignment of Robinson's wages. The note was not signed by Robinson but by Larry Gillman as his "Attorney-in-Fact" under a power of attorney.
 
 
 46
 The loan on its face furnished by Conlon and Arnold Partners was actually disbursed by a different entity, Stillwater Pond Partners. This entity had been organized three months earlier, in February 1993, as a real estate development company. It was not a bank, mortgage company, or commercial lender. Among its general partners were Kyle Arnold, J. Regis Conlon, and Sebastian S. Ciarcia. The partnership agreement made Kyle Arnold the partnership's attorney-in-fact to act in its name. On May 18, 1993 a Closing Statement Refinance showed specific disbursements of $60,000 chargeable to this loan, among them $1,000 "Legal Fee" to Ciarcia, $7,000 "Private Mortgage Fee" and $4,000 "Origination Fee," the payees of the latter two fees unnamed. In addition $80,000 is shown as "Advances Made" with no payees identified, and $110,000 is shown as "Advances Not Made." Gillman, acting for Robinson, "accepted and approved" these disbursements.
 
 
 47
 A second document, headed "Accounting for Loan # 2 to Clifford Robinson May 18, 1993 by Conlon & Arnold Partners," shows $2,000 paid to "Atty. S. Ciarcia"; $10,000 paid to "F.X. Conlon II certified funds"; $23,000 paid to "FX and K Conlon"; and $13,000 paid to "JR Conlon/FX Conlon II." There are also items under the heading "Plus." Under Plus is a $10,000 "Discount fee to partner (Conlon & Arnold)"; an $11,500 "broker fee to K. Arnold 5-1/2%"; and "Interest" of $3,924. As fees on a loan for six weeks, Arnold and Conlon have charged up front $21,500. The total disbursements recorded were $234,756. Close to $60,000 of the disbursements were to Conlon and Arnold, and $11,500 were disbursed to Arnold alone. All the disbursements are attributed to Stillwater Pond Partners. According to the deposition of J. Regis Conlon, this sum was treated as Stillwater Pond Partners' "capital contribution" to OSP. It is the same amount listed on the June 25, 1993 Closing Statement Refinance as the "Payoff" made OSP from its own loan of $468,000 to Robinson.
 
 
 48
 The record to this point shows a tangled web of finance in which Kyle Arnold plays a prominent part and Sebastian S. Ciarcia is visibly present. In little over a month three different entities, none of them commercial lenders and none of them philanthropists, had a hand in financing Robinson. Arnold and Conlon have already been paid a total of over $97,000 ($71,500 plus $25,740). Robinson remains liable for $468,000.
 
 
 49
 More is provided by the roles of Kyle Arnold, Sebastian S. Ciarcia, and Larry Gillman. Kyle Arnold had been the originator of the initial construction loan from the Shawmut in Boston. He left the Shawmut and in March 1993 was contacted by Larry Gillman to arrange further financing of the construction. He had ten to twelve conversations with Gillman between March and June 25, 1993. He was the only partner in OSP familiar with Gillman.
 
 
 50
 Arnold's "primary partner" was Conlon, and they worked together with Ciarcia, who drafted the loan documents. Arnold or Ciarcia made all the disbursements from the loans. Ciarcia acted as Robinson's trustee in disbursing the Stillwater Pond Partners loan. Ciarcia was also paid $2,000 as Robinson's attorney on the May 18, 1993 loan, and $1,000 as Robinson's attorney in the June 25, 1992 loan. Ciarcia, however, met Robinson only at the time of the closing of the June 25, 1993 loan. According to Ciarcia, he then told Robinson that he was representing both Robinson and OSP. He did not disclose to Robinson that he was a general partner in Stillwater Pond Partners, although Stillwater Pond Partners was a partner of OSP.
 
 
 51
 Ciarcia was also the lawyer for Conlon Arnold Partners in the May 18, 1993 loan to Robinson. As he did not meet Robinson until June 25, he did not disclose his dual role in this loan which was the foundation of the June 25 loan. In his answer to Robinson's interrogatories, Ciarcia maintained, "Cliff Robinson is the only person that I received payment for services as indicated in the Closing statement refinance." He was paid by Robinson, but worked for both sides.
 
 
 52
 The success of Stillwater Pond Partners and OSP in becoming Robinson's creditors could not have happened without Larry Gillman. What did Gillman get out of their arrangements? The disbursements made by Ciarcia shows Stillwater Pond Partners on July 13, 1993 paying $10,000 to Sports Review Association; Sports Review was Gillman's enterprise. Beginning on August 13, 1993 and continuing over the next year Stillwater Pond Partners made advances to Larry Gillman. For three years nothing was collected on the advances. As of April 16, 1997, "the principal balance is approximately $130,000 plus accrued interest." No effort at collection had been made. In short, Larry Gillman received $10,000 for Sports Review and a loan of $130,000 from OSP, the ad hoc partnership formed to loan money to Robinson.
 
 
 53
 In addition, Arnold was aware from his days at the Shawmut that Robinson had given Gillman a broad power of attorney to enable Gillman to act for him in supervising the construction of the house. Arnold knew that Gillman signed the promissory note on May 18, 1993 in Robinson's name. Arnold or Ciarcia made a series of disbursements from the construction loans in checks simply made out to Robinson and delivered to Gillman. Gillman was then in a position to endorse and deposit these checks and draw upon them as he saw fit. Stillwater Pond Partners delivered such checks to Gillman in the amount of $45,172, and OSP delivered checks in the amount of $22,000, so that Gillman received a total of $67,172 in no way tied to construction costs. When Kyle Arnold was questioned in his deposition as to what he thought was being done with such checks, he replied that disbursements were made "to Larry with checks made out to Cliff Robinson hoping that that money was supposedly going into the house, but Larry had mentioned to us on several occasions that it was going for other things as well." According to Arnold, the lenders made disbursements at Larry Gillman's direction "freely because we were collateralized by his [Robinson's] NBA contract." Arnold, in fact, relied on Gillman's estimate of what the loan should be when the figure of $250,000 for the May 18 loan was arrived at, even when Gillman said the money was "being used by Cliff not only for the property but for other uses." At no time before June 25, 1993 did Arnold talk to Robinson himself.
 
 
 54
 In a separate suit brought against Larry Gillman in 1995, Robinson obtained the affidavits of several contractors who worked on Robinson's house. These affidavits were introduced into the record in this case. Thomas Borges stated that he furnished framing and carpentry work in the construction of Robinson's house and that as a condition of receiving payment and keeping the job he had to pay Larry Gillman "approximately 30%-40% of the value of each check I received" and that, in addition, Borges was compelled by Gillman to do $30,000 worth of carpentry on Gillman's own house. Andrew Morin swore that he provided climate control services for the Robinson house. His contract for this work included an explicit provision that he provide heating and air conditioning at Gillman's residence as well; the contract is part of the record in this case. Wayne Burritt did excavation work on the Robinson property for $58,800; in his affidavit he stated he was compelled to pay Gillman a kickback of $5,000. Both Burritt and Borges stated that it was reported to them that other contractors made similar kickbacks. Borges, Burritt and Morin's company were all recipients of payments disbursed by Ciarcia as trustee for Robinson.
 
 
 55
 All of the above facts were part of the record at the time the district court granted summary judgment. None of the these facts were disputed. The inferences that could reasonably be drawn were disputed. The following inferences could reasonably be drawn in favor of Robinson:
 
 
 56
 INFERENCES A RATIONAL JUROR COULD DRAW IN ROBINSON'S FAVOR
 
 
 57
 (As these inferences would not be beyond dispute if the case went to trial, they are set off to indicate this disputable status).
 
 
 58
 Robinson was being served by a crooked agent, who was corrupt, greedy, and so sure of not being caught that he could insert in a contract for Robinson a provision for work on his own home. This agent, Larry Gillman, needed more financing to finish the construction and to pay the contractors who were giving kickbacks to him. Gillman contacted Kyle Arnold, who arranged the needed financing, which was staged in two steps, May 18, 1993 and June 25, 1993. Multiple entities were used, permitting Arnold and Conlon to earn large fees and to disguise the first set of fees by not specifically noting them in the disbursements of the June 25 loan. Arnold successfully hid from Robinson that of the $468,000 outstanding debt as of June 25, 1993, over $97,000 had gone to Arnold and Conlon.
 
 
 59
 Robinson's representative, Gillman, was a willing party to this fraud because he received $10,000 from Stillwater Pond Partners for his Sports Review and the use of three checks unrestricted to construction purposes that he could convert to his own use. Schedule A, which was attached to the June 25, 1993 Closing Statement Refinance and documented "Construction costs" already incurred, shows $22,000 disbursed to Cliff Robinson. The accounting for the May 18, 1993 loan shows two checks totaling $45,172 payable to Cliff Robinson. The total checks shown as made out in this fashion and not paid for any construction costs total $67,172. In addition, the refinancing enabled Gillman to pay contractors who were making kickbacks to him.
 
 
 60
 Gillman's close association with Arnold, whom he had not known before the Shawmut loan, is confirmed by the large advances Stillwater Pond Partners, dominated by Arnold, began to make to Gillman beginning in August 1993. Arnold and Gillman worked hand and glove in the refinancing of the Robinson house and a close financial relation followed after the June 25 closing, cemented by the $10,000 in July 1993 to Sports Review and the subsequent stream of advances from Stillwater Pond Partners to Gillman.
 
 
 61
 The lawyer who purported to be Robinson's lawyer in both the May 18, 1993 and June 25, 1993 loans and was paid by Robinson for his legal services, was also the lawyer for the lenders. Ciarcia did not disclose his dual role to Robinson at the time of the May 18 loan which was the foundation of the June 25 deal. Ciarcia did disclose his representation of OSP on June 25 when he met Robinson for the first time. At all times he concealed from Robinson his own interest in Stillwater Pond Partners. Ciarcia has continued his concealment into this case by submitting pro se a "Concise Statement of Material Facts In Support of Motion for Summary Judgment," in which he listed the partners of OSP, but omitted Stillwater Pond Partnership of which he is a partner.
 
 
 62
 In summary, reasonable inferences from the undisputed facts are that Arnold and Ciarcia conspired with Gillman to set up the May-June financing in a way to enrich Arnold and Gillman to the detriment of Robinson and concealed from Robinson the deceit of his agent Gillman and the dual role of his lawyer and trustee, Ciarcia. $174,172 of the total $468,000 for which Robinson became responsible by the note of June 25, 1993 had not gone for the construction of his house, but had gone to Sports Review ($10,000), to Larry Gillman as his attorney without restriction ($67,172), and to Arnold and Conlon as loan brokers ($97,000).
 
 
 63
 According to the affidavit of Dale Glasser, the accountant who prepared Robinson's 1993 tax return, he did not receive from Gillman a copy of the May 18, 1993 Closing Statement Refinance, nor did he receive a copy of Schedule A allegedly attached to the June 25, 1993 Closing Statement Refinance. The fraud was thus concealed from Robinson's representative. Confirming the inferences of fraud are the records of disbursements and the kind of accountings made by Conlon and Arnold Partners, Stillwater Pond Partners, and OSP: the records submitted by them in this case are sketchy, and the dates that these records were compiled are not certain. As the district court observed: it is difficult to accept the fact that the lenders (Arnold and Ciarcia) who undertook the duty of disbursing the loan funds on Robinson's behalf "would not keep copies of the bills they are paying." Further, there is evidence to suggest the records have been doctored. The Closing Statement Refinance for the May 18, 1993 loan shows check number 265 for $10,000 already disbursed from Stillwater Pond Partners to Sports Review, yet an exhibit entitled "Funds Provided and Unpaid Fees Earned" attached to Kyle Arnold's Supplemental Affidavit dates check 265 for $10,000 to Sports Review as paid on July 13, 1993. The inference is almost irresistible that the May 18 statement was made up after July 13.
 
 
 64
 The majority opinion makes three errors. First it treats the summary judgment granted by the district court as though it could be resolved by alleged deficiencies in Robinson's pleading. It compounds this error by depending, in part, on Connecticut law on pleading. For example, the majority states that "[f]raudulent concealment under Connecticut law requires that Robinson plead and prove three elements" and concludes that it is "unable to ascertain any allegation of fraudulent concealment as required by Connecticut law." The majority relies on two Connecticut cases to reach this conclusion. This search for the proper pleading under Connecticut law is contrary to the Federal Rules of Civil Procedure that simply require that the circumstances constituting fraud be stated with particularity. Fed.R.Civ.P. 9(b). The majority's quotations from Robinson's cross-claims show them to be sufficiently particular to meet the standard. In any event, the defendants waived any objection to the pleadings by not moving for dismissal. To use the pleadings as a way of sustaining summary judgment is to bring in a major red herring. Summary judgment has to be decided on the basis of the facts undisputed and inferable on the record before the district court.
 
 
 65
 As the foregoing summary of these facts has made clear, there was abundant evidence before the district court that the defendants had concealed their fraud from Robinson. The majority refers to these facts as "arguments." They were not arguments. They were facts plainly in the record and facts that a reasonable jury could infer from the facts plainly in the record.
 
 
 66
 The majority acknowledges that Federal Rule of Civil Procedure 8(c) requires a district court to treat a claim misdesignated as a counterclaim as an affirmative defense "if justice so requires." The majority holds that the district court did not abuse its discretion in denying the redesignation. To reach this result the majority ignores the fact that the district court surprised the parties with its grant of summary judgment at the very time that the parties were preparing a joint pretrial order and had scheduled a pretrial conference. The district court had before it the same record that has been set out here. It is difficult to know what justice does require if the facts and the inferences from the facts of this case do not require that Robinson be given the opportunity to show at trial that he was swindled by his agent, by his lawyer, and by his lenders.
 
 
 67
 The majority holds that a motion for reconsideration should not be granted "absent highly unusual circumstances, unless the district court ... committed clear error...." Ruling as it did on the record before it, the district court did commit clear error. The majority opinion carefully refrains from analyzing the record, refrains from either analyzing or denying the undisputable facts, and refrains from drawing the inferences that a reasonable juror would draw from these facts. Mischaracterizing the record and avoiding the requirements of justice, the majority opinion stands as a monument of legal formalism.
 
 
 
 *
 For Amended Opinion and Dissent, see 1999 WL 355959
 
 
 [1]
 The dissent makes much of facts which might very well lead to a conclusion that Robinson was "swindled" and accuses us of "legal formalism" in refusing to find a way to provide relief to Robinson. We are not unimpressed by evidence on the record which calls into question the forthrightness of OSP's and the individual defendants' dealings with Robinson. However, when claims are time-barred, we cannot consider their merits no matter how "unfair" the result may seem
 
 
 [2]
 The dissent would require pleading by the standards of Rule 9(b) without considering Connecticut's substantive law of fraudulent concealment. However, our approach in this case comports with circuit precedent. See Moore v. Brewster, 96 F.3d 1240, 1245-46 (9th Cir.1996) (requiring the plaintiff to plead the state-law elements of fraud according to the standards of Rule 9(b)). Robinson was required to plead, with particularity, each Connecticut-law element of fraudulent concealment
 
 
 [3]
 Ciarcia did not plead the affirmative defense of the statute of limitation in his answer. We recognize that failure to raise the statute of limitation as an affirmative defense constitutes waiver of the defense. Grabner v. Willys Motors, Inc., 282 F.2d 644, 646 (9th Cir.1960). However, Robinson did not argue waiver before the district court or on appeal to this court, so the issue is not properly before us on appeal
 The dissent contends that OSP's and the individual defendants' failure to move to dismiss Robinson's complaint on statutes of limitation grounds waived the defense. Not only is this not the law, Robinson does not raise a waiver argument on appeal.
 
 
 [4]
 The dissent argues: "It is difficult to know what justice does require if the facts and the inferences from the facts of this case do not require that Robinson be given the opportunity to show at trial that he was swindled." The dissent's error is in looking to the alleged underlying facts to determine whether justice requires redesignation of Robinson's claims. Justice is not served by permitting a litigant to drop the ball in his lawsuit and seek to have it resurrected--at the expense of the other parties and the tax-paying public--by alleging egregious facts which invoke sympathy for the litigant's plight. Our decision that the district court did not abuse its discretion in refusing to redesignate Robinson's cross-claims is based on Robinson's failings during the litigation, not on the seriousness of his alleged substantive claims