**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| INTERNATIONAL PETROLEUM PRODUCTS AND ADDITIVES COMPANY, INC., Judgment Creditor, | No. 22-15109 |
| | D.C. No. 4:19-cv-03004-YGR |
| *Plaintiff-Appellee*, | |
| v. | OPINION |
| BLACK GOLD S.A.R.L., Judgment Debtor; LORENZO NAPOLEONI, Shareholder; SOFIA NAPOLEONI, Shareholder, | |
| *Defendants-Appellants*. | |

| | |
|---|---|
| INTERNATIONAL PETROLEUM PRODUCTS AND ADDITIVES COMPANY, INC., Judgment Creditor, | No. 22-16341 |
| | D.C. No. 4:19-cv-03004-YGR |
| *Plaintiff-Appellee*, | |
| v. | |
| BLACK GOLD S.A.R.L., Judgment Debtor, | |

*Defendant*,

and

LORENZO NAPOLEONI,
Shareholder; SOFIA NAPOLEONI,
Shareholder,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted February 12, 2024
San Francisco, California

Filed September 16, 2024

Before:  Carlos T. Bea, David F. Hamilton,[*] and Morgan
Christen, Circuit Judges.

Opinion by Judge Bea

---

[*] The Honorable David F. Hamilton, United States Circuit Judge for the
U.S. Court of Appeals for the Seventh Circuit, sitting by designation.

## SUMMARY[**]

### Bankruptcy

The panel affirmed the district court's judgment and award of attorneys' fees and costs in favor of judgment creditor International Petroleum Products and Additives Co., confirming and enforcing IPAC's arbitration award against Black Gold, S.A.R.L., a foreign company, and against Lorenzo and Sofia Napoleoni as owners and alter egos of Black Gold.

After the district court entered judgment confirming the arbitration award against Black Gold, and IPAC sought discovery of Black Gold's assets, Black Gold petitioned the bankruptcy court for recognition of its Monaco bankruptcy proceedings. The bankruptcy court denied this petition on March 15, 2021. Black Gold appealed to the Bankruptcy Appellate Panel, and the bankruptcy court lifted a provisional stay it had imposed while it considered Black Gold's petition. This allowed IPAC to continue its collection efforts in the district court action. As a sanction for Black Gold's discovery misconduct, the district court inferred the necessary facts and granted IPAC's motion to add the Napoleonis as judgment debtors on the theory that they were Black Gold's alter egos.

Black Gold and the Napoleonis appealed to this court, and while the appeal was pending the Bankruptcy Appellate Panel reversed the bankruptcy court's order denying Black Gold's petition for recognition of the Monaco proceedings

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and held that the petition must be granted. When such a petition is granted, any action against the debtor corporation, or against any of its property located in the United States, is automatically stayed under 11 U.S.C. § 1520. This court stayed the appeal as to Black Gold, the debtor in the Monaco proceedings. This court denied the Napoleonis' motion to remand for the district court to reconsider its final judgment but allowed the Napoleonis to renew the motion provided that they raise their argument that the automatic stay extended to IPAC's alter ego claim before the district court in the first instance as a motion for relief from judgment under Fed. R. Civ. P. 60(b). The Napoleonis instead reprised this argument in their opposition to IPAC's motion for attorneys' fees. The district court granted IPAC's motion and ordered the Napoleonis to pay IPAC's attorneys' fees and costs, in addition to IPAC's $1 million arbitration award.

There was no dispute that the automatic bankruptcy stay applied to IPAC's enforcement of its judgment award against Black Gold in the district court. The panel held that the Bankruptcy Appellate Panel's order reversing the bankruptcy court's March 15, 2021, denial of Black's Gold's petition for recognition of the Monaco proceedings did not result in the retroactive trigger of the automatic stay as of March 15, 2021. The panel concluded that the Napoleonis' argument that it should use its equitable powers as a workaround to the clear language of § 1520 was foreclosed because the Napoleonis failed to move for a stay of the bankruptcy court's denial of Black Gold's petition pending Black Gold's appeal to the Bankruptcy Appellate Panel.

The panel also held that the automatic stay, once triggered, did not encompass IPAC's alter ego claim against the Napoleonis. Applying California law, the panel rejected the argument that IPAC's alter ego claim was the property

of Black Gold's estate that only Black Gold's trustee, not IPAC, could pursue.

The panel addressed the Napoleonis' remaining arguments for reversal in a concurrently-filed memorandum disposition.

## COUNSEL

Patrick Burns (argued), Anthony J. Dutra, Shandyn H. Pierce, and Gary A. Watt, Hanson Bridgett LLP, San Francisco, California; Adam W. Hofmann, Hanson Bridgett LLP, San Francisco, California; for Defendants-Appellants.

Vinay V. Joshi (argued) and Andrew T. Oliver, Amin Turocy & Watson LLP, San Jose, California, for Plaintiff-Appellee.

## OPINION

BEA, Circuit Judge:

Foreign companies which declare bankruptcy in their home countries have the option of filing a petition in United States bankruptcy court that seeks "recognition" of those foreign bankruptcy proceedings. If the petition is granted, any action against the foreign debtor corporation—or against any of its property located within the United States—is automatically stayed under 11 U.S.C. § 1520 of the Bankruptcy Code. In this case we confront two questions regarding that statutory provision.

The first question concerns timing: Does an order that *denies* a petition for recognition retroactively trigger Section 1520's automatic bankruptcy stay to the date when the petition for recognition was denied if the denial order is later reversed by a higher court? The second question concerns scope: Does the automatic stay, once triggered, encompass a creditor's garden-variety alter ego claim against the foreign debtor's sole owners? Because our answer to both questions is "No," we affirm the district court's judgment below.

# I

## A

Plaintiff-Appellee International Petroleum Products and Additives Company (IPAC), a California-based company, develops petroleum-based lubricant products that help protect engines, transmissions, and other types of mechanical equipment from erosion and wear. In 2016, the company entered into two agreements—a sales agreement and a distribution agreement—with Black Gold S.A.R.L., a limited liability company headquartered in the Principality of Monaco. The terms of the sales agreement obligated Black Gold to act as IPAC's sales representative as to a predetermined schedule of customers in return for a 3.5% commission on the dollar value of any sales Black Gold made. Under the distribution agreement, Black Gold itself purchased IPAC's products and sold them at a markup to a different schedule of customers.

As with most contracts of this sort, the distribution and sales agreements gave Black Gold access to a host of sensitive IPAC business information—customer lists, pricing methods, the volume of products shipped or sold, research and development, and the like. Naturally then, the agreements contained non-disclosure and non-compete

provisions. Neither Black Gold nor any of its officers, agents, or employees, for example, could disclose IPAC's sensitive information to any third parties while the agreements were in effect and for a period of five years thereafter. Black Gold also promised not to develop any products that competed with IPAC's products while the agreements were in place. And Black Gold agreed to return all of IPAC's property and business records to IPAC once the agreements terminated.

Black Gold did not live up to any of these contractual obligations. But IPAC learned of Black Gold's breaches only after the two parties mutually terminated the distribution and sales agreements in 2018. While the agreements were still in effect, Lorenzo Napoleoni, Black Gold's CEO and 50% shareholder, held meetings undisclosed to IPAC with two of IPAC's chemists—Mr. Plitt and Dr. Crow—about the prospect of forming a company that would compete with IPAC in the petroleum additives market.[1] To his credit, Dr. Crow backed out of the talks after expressing "concern[s] about how . . . they [could] proceed in such a new business without using IPAC Confidential Information." In 2017, Mr. Plitt left IPAC to join Mr. Napoleoni on this new venture, but only after he surreptitiously emailed himself a confidential password-protected Excel spreadsheet "detailing the identity, vendor, price, and relative composition for each component in each of IPAC's products," as well as "large amounts of other IPAC Confidential Information relating to IPAC sales and pricing."

---

[1] Mr. Napoleoni's wife, Sofia Napoleoni, owns the other 50% of Black Gold.

Later in 2017, while the sales and distribution agreements were still in effect, Mr. Napoleoni and Mr. Plitt founded PXL Chemicals BV, a Netherlands-based company. "[D]espite . . . having no test facilities, no formulation capability, no blending or other technical expertise, and no chemists," PXL was selling lubricant products in competition with IPAC "[l]ess than five months after PXL . . . was founded." According to IPAC's expert, PXL's products were "so strikingly similar to IPAC['s] products" that "they c[ould] be called knock-off[s]." In fact, that was exactly what PXL "t[old] its customers." Most revealing of all, when asked during the arbitration how PXL could sell lubricant products "in such a short time" and "with such similarity" to IPAC's products without using IPAC's confidential product information, Mr. Napoleoni admitted that the explanation was as simple as it seemed, he "had [IPAC's information] available, and yeah. That's it."

PXL's entry into the market caused IPAC "a steep drop-off of business." IPAC's "steady" flow of revenue in 2016 started to decline in 2017—the year PXL was founded—and then "fell precipitously . . . to zero" in the latter part of 2018. Reeling from these losses, IPAC filed an arbitration demand against Black Gold, as the sales and distribution agreements provided.[2] IPAC's demand asserted, among other claims, breach of the sales and distribution agreements, tortious interference, and trade secret misappropriation. After a three-day hearing in San Francisco, the arbitrator found in IPAC's favor on all claims and issued IPAC an award in

---

[2] IPAC had also named the Napoleonis in its arbitration demand, but the arbitrator dismissed them as respondents because they were not parties to the sales and distribution agreements.

excess of $1 million—the sum total of IPAC's damages, administrative costs, and attorneys' fees.

## B

Winning in arbitration was only part of the battle for IPAC. There was still the matter of collecting its $1 million arbitration award from Black Gold, and that would prove far more difficult for IPAC than winning on the merits of its claims.

IPAC's collection efforts started out smoothly enough. After the arbitrator handed down his award, IPAC filed an action in the Northern District of California that same month. The action petitioned for confirmation and enforcement of IPAC's $1 million arbitration award under the Federal Arbitration Act, 9 U.S.C. § 9, as well as entry of judgment of the award against Black Gold as the sole judgment debtor, all of which the district court granted in full. With its arbitration award confirmed, and judgment against Black Gold entered, IPAC's action transitioned to the post-judgment, asset discovery phase. In an effort to uncover potential assets of Black Gold that could satisfy its judgment, IPAC served Black Gold 11 interrogatories, 32 requests for admission, and 30 requests for production.

Black Gold "completely stonewalled" IPAC's discovery efforts. Instead of providing substantive answers to IPAC's discovery requests, Black Gold refused to produce a single document and instead lodged baseless objections disputing, for example, the meaning of words such as "you" and "hold assets" as vague and ambiguous. Even when the magistrate judge, on IPAC's motion to compel, found "all of Black Gold's objections" "wholly meritless," and ordered Black Gold to respond to IPAC's discovery requests within 50 days, Black Gold still did not meaningfully comply. It

produced fewer than 100 documents by the court-ordered deadline and "for nearly 10 months" it "simply ignored th[e] court's order" to answer IPAC's 11 interrogatories.

IPAC also noticed depositions for the Napoleonis, but that also faced delay. Ten days before those depositions were to take place, Black Gold declared bankruptcy in Monaco where it was headquartered. Black Gold's trustee in the Monegasque proceedings then petitioned the Northern District of California's bankruptcy court for "recognition" of the Monaco proceedings under Chapter 15 of the United States Bankruptcy Code. The bankruptcy court provisionally stayed all ongoing actions against Black Gold—including IPAC's enforcement of its judgment award—"[p]ending disposition of [Black Gold's Chapter 15] Petition." The provisional stay therefore paused the Napoleonis' depositions. More importantly, however, Black Gold's Chapter 15 petition threatened to delay IPAC's enforcement-of-judgment action indefinitely. If Black Gold's petition were granted, and the Monaco proceedings were "recogni[zed]," then IPAC's enforcement action against Black Gold would be automatically stayed under Chapter 15 until the Monaco proceedings terminated. *See* 11 U.S.C. § 1520(a)(1).

The bankruptcy court, however, denied Black Gold's Chapter 15 petition in an order dated March 15, 2021—a date to keep an eye on. Order, *In re Black Gold S.A.R.L.*, No. 20-bk-41815, ECF No. 72 (Bankr. N.D. Cal. Mar. 15, 2021). In the court's view, Black Gold's petition was a "sham" designed to "preclude IPAC from recovering on its [arbitration] judgment" in the separate enforcement action in the Northern District of California. Among the most obvious signs that Black Gold filed its petition in bad faith was the fact that Black Gold fixed the date of its own insolvency in

the Monaco proceedings as the day *before* IPAC won its $1 million award in arbitration, a move "clearly aimed [to] thwart[] the legitimate [collection] efforts of IPAC, the only significant creditor Black Gold ha[d]."

Black Gold timely appealed the bankruptcy court's order to this Circuit's Bankruptcy Appellate Panel (BAP). Because neither Black Gold nor the Napoleonis moved the bankruptcy court to stay its denial of Black Gold's Chapter 15 petition pending that order's appeal to the BAP, the bankruptcy court lifted the provisional stay that it previously imposed while it considered Black Gold's petition. This allowed IPAC to continue its collection efforts in the district court action.

With its action to enforce its judgment resumed, IPAC then moved the district court to add Mr. Napoleoni and his wife, Sofia Napoleoni, as judgment debtors on the theory that they were Black Gold's alter ego. By then, IPAC's action to enforce its judgment award against Black Gold was more than two years old. Yet Black Gold's discovery misconduct throughout that period had made it next to impossible for IPAC to gather the facts necessary to prove its alter ego theory. IPAC thus separately moved the district court to infer those facts as a form of sanctions for Black Gold's discovery misconduct. *See* Fed. R. Civ. P. 37(b).

The district court granted both of IPAC's motions. The court first agreed with IPAC that "Black Gold's repeated failure to comply with previous court [discovery] orders" warranted adverse inferences under Rule 37(b). The court then, pursuant to Rule 37(b), adopted the following "designated" facts as true: that Mr. Napoleoni, as Black Gold's 50% shareholder and sole officer, "diverted" Black Gold's "funds" and "business" "to undercapitalize Black

Gold . . . to avoid paying [IPAC's] judgment" and that he "continu[es] to profit from the illicit use of IPAC's trade secrets by making and selling" knockoff petroleum additive products. Lastly, while the parties disputed whether California's or Monaco's test for alter ego liability applied, the district court saw this as a "non-issue" because both jurisdiction's alter ego tests were substantively the same. With that, the district court concluded, based on the above adverse inferences, that the Napoleonis were Black Gold's alter ego under both California and Monaco law.

The district court then amended its final judgment to add the Napoleonis as judgment-debtors to IPAC's $1 million arbitration award, and Appellants timely appealed.

**C**

While that appeal was pending, the BAP reversed the bankruptcy court's order that had denied Black Gold's Chapter 15 petition for recognition of the Monaco proceedings. *In re Black Gold S.A.R.L.*, 635 B.R. 517 (9th Cir. BAP 2022). Although the BAP agreed with the bankruptcy court that Black Gold's insolvency proceedings in Monaco were a sham, in the BAP's view, that was a legally insufficient basis to deny Black Gold's Chapter 15 petition.

As the BAP read Chapter 15, there was little room for a bankruptcy court to exercise its discretion and deny a petition for recognition. So long as the face of the petition satisfied certain threshold pleading requirements (all of which Black Gold's petition met here), "recognition was mandatory" unless it was "manifestly contrary to U.S. public policy." *Id.* at 528. This "public policy" exception, the BAP explained, was a narrow exception to begin with, and did not depend solely on whether the foreign debtor had acted in bad

faith. *See id.* at 529–32. Thus, while Black Gold's insolvency proceedings in Monaco "were clearly designed to thwart the collection efforts" of IPAC, its "largest creditor," that alone "[wa]s not a proper basis" for the bankruptcy court to deny Black Gold's petition. *Id.* at 531. Rather than remand for the bankruptcy court to decide whether the public policy exception applied, the BAP did the analysis itself and held that it did not. *See id.*

Because IPAC did not appeal the BAP's decision in *In re Black Gold*, the decision became final. And because the BAP's decision was a flat reversal of the bankruptcy court's denial of Black Gold's Chapter 15 petition for "recognition" of the Monaco proceedings, it was, in effect, a grant of Black Gold's petition that triggered the automatic bankruptcy stay. For that reason, we stayed Appellants' appeal of the district court's final judgment but "for Black Gold . . . only," because the Napoleonis were not debtors in the Monaco insolvency proceedings. *See* Order, *IPAC v. Black Gold*, No. 22-15109, Dkt. Entry No. 15 (June 22, 2022).

The Napoleonis subsequently moved this Court to remand this case back to the district court so that it could reconsider its final judgment in light of the BAP's decision in *In re Black Gold*. They argued, much as they do now, that IPAC's alter ego claim against them was subject to the automatic bankruptcy stay because the claim was the "property" of Black Gold's estate that only Black Gold's trustee could assert. Thus, the argument went, IPAC had no authority to assert the alter ego claim against the Napoleonis, and the district court's final judgment was void to the extent it granted IPAC relief against the Napoleonis on an alter ego theory.

We denied the Napoleonis' motion to remand but allowed them to renew it, provided they raised their argument that the automatic stay extended to IPAC's alter ego claim before the district court in the first instance as a motion for relief from judgment under Federal Rule of Civil Procedure 60(b). *Id.* (permitting a district court, on a motion, to "relieve a party . . . from a final judgment" on the ground the judgment "is void"); Dkt. Entry No. 36 (Oct. 19, 2022). The Napoleonis, however, failed to move the district court for relief under Rule 60(b). They instead reprised their theory that IPAC's alter ego claim was subject to the automatic bankruptcy stay in their opposition to IPAC's motion requesting that the Napoleonis pay its attorneys' fees that IPAC had filed shortly after the district court amended its final judgment to include the Napoleonis as judgment debtors. The district court rejected the Napoleonis' argument, granted IPAC's motion, and ordered the Napoleonis to pay IPAC upwards of $146,000 in attorneys' fees and costs—in addition to IPAC's $1 million judgment award. The Napoleonis timely appealed to us.

## II

We have jurisdiction under 28 U.S.C. § 1291 to review both the district court's final judgment holding the Napoleonis personally liable for IPAC's $1 million arbitration award and the district court's order granting IPAC's motion for attorneys' fees and costs. Whether the judgment or order of a district court is void for violating the automatic bankruptcy stay is reviewed de novo. *See In re Mwangi*, 764 F.3d 1168, 1173 (9th Cir. 2014).

## III

The automatic bankruptcy stay is well familiar and needs only a brief introduction. "[D]esigned to provide breathing

space to the [bankrupt] debtor, . . . [and] assure that all claims against [him] will be brought in the sole forum of the bankruptcy court," Section 362 of the Bankruptcy Code provides that a debtor's filing of a bankruptcy petition in the United States operates as a self-executing stay that halts "almost any type of formal or informal action against the debtor or property of the [debtor's] estate." *Burton v. Infinity Cap. Mgmt.*, 862 F.3d 740, 746–47 (9th Cir. 2017) (citation omitted). It is "one of the most important protections in bankruptcy law" for domestic entities that file for bankruptcy in the United States. *Porter v. Nabors Drilling USA, L.P.*, 854 F.3d 1057, 1061 (9th Cir. 2017) (citation omitted).

In 2005, Congress added Chapter 15 to the Bankruptcy Code, which extended the protections of the automatic bankruptcy stay to foreign entities that declare insolvency in their home countries. *See* 11 U.S.C. § 1520(a)(1). For a foreign debtor to invoke the protection of automatic bankruptcy stay, he must first file a petition for "recognition" of the foreign bankruptcy proceedings. *Id.* § 1515. Unlike in the domestic bankruptcy context, however, the mere filing of the petition does not itself trigger the automatic stay. Only "[u]pon" the "entry of an order granting recognition" of the foreign bankruptcy proceedings does the automatic stay come into effect. *Id.* §§ 1520(a), 1502(7) (defining "recognition"). But, once triggered, the stay's protections apply in full force "with respect to" the "debtor" who is "the subject of [the] foreign [bankruptcy] proceeding," *id.* § 1502(1), and any of the debtor's "property" that is "within the territorial jurisdiction of the United States," *id.* § 1520(a)(1).

Everyone agrees that the automatic bankruptcy stay applies to IPAC's enforcement of its judgment award against

Black Gold in the district court below. The BAP settled that question when it reversed the bankruptcy court's order denying Black Gold's petition for recognition of the Monaco proceedings. The dispute, rather, is over timing and scope: When did the automatic stay begin and what or whom else does it protect (other than Black Gold)?

On the question of timing, the Napoleonis argue that the stay took effect on the date that the bankruptcy court denied Black Gold's petition for recognition of the Monaco proceedings—March 15, 2021—because the BAP reversed that order in *In re Black Gold*. The Napoleonis, in other words, urge us to give the BAP's reversal retroactive effect, even though their "[r]esearch has not revealed a case . . . []in this circuit" where we have ever done that.

March 15, 2021, matters greatly to the Napoleonis. If it marks the date when the automatic bankruptcy stay took effect, any court action or decision between then and now in IPAC's enforcement-of-judgment action against Black Gold would be void. *See Burton*, 862 F.3d at 747. That would include the district court's December 2021 order that sanctioned Black Gold for its discovery misconduct and granted IPAC's motion to add the Napoleonis as judgment debtors on the ground that they were Black Gold's alter ego. Recall, as punishment for Black Gold's discovery abuses, the December 2021 order drew adverse factual inferences against Black Gold, which then served as the factual predicates for the district court's finding that the Napoleonis were Black Gold's alter ego. The Napoleonis argue that it violated the stay for the district court to draw those inferences against Black Gold in the first place, and that the district court's alter ego determination is therefore void as well because it rested on factual findings that the district court had no authority to make.

As for the separate issue of scope, the Napoleonis raise two arguments. They first contend that IPAC's alter ego claim—the linchpin holding together IPAC's enforcement-of-judgment action against the Napoleonis—is subject to the automatic bankruptcy stay because it is the "property" of Black Gold's bankruptcy estate that only Black Gold's trustee may assert. If that argument does not persuade, the Napoleonis argue that this case presents the "perfect opportunity" for us to recognize, as an exception to the general rule, that a non-debtor is the "debtor" for the purposes of the automatic bankruptcy stay under Chapter 15 if he is found to be the alter ego of the foreign bankrupt company. If we accept either argument, the Napoleonis argue, then we should hold that IPAC's enforcement-of-judgment action against the Napoleonis can proceed no further, and we must, at the very least, vacate the district court's final judgment that held the Napoleonis liable for IPAC's judgment along with the court's subsequent award of attorneys' fees against the Napoleonis.

We address each of the Napoleonis' arguments in turn.[3]

## A

It is a matter of first impression whether the reversal of a bankruptcy court order that denies a Chapter 15 petition for recognition of a foreign insolvency proceeding retroactively triggers the automatic bankruptcy stay under Section 1520. But the answer is as straightforward as the question is novel. As explained below, the bankruptcy court's March 15, 2021, order, which denied Black Gold's Chapter 15 petition for

---

[3] The Napoleonis' remaining arguments for reversal do not warrant publication. We dispose of them in a memorandum disposition filed concurrently with this opinion.

recognition, did not trigger the automatic stay under Section 1520's plain language. Only when a petition for "recognition" is "grant[ed]" does the automatic stay begin. *See* 11 U.S.C. § 1502(7). And while the BAP's decision in *In re Black Gold* unequivocally reversed the bankruptcy court's denial order, the circumstances here hardly "warrant the drastic remedy" of giving the BAP's reversal retroactive effect. *See In re Lomagno*, 429 F.3d 16, 18 (1st Cir. 2005).

As noted, Section 1520's plain text provides only that the automatic bankruptcy stay begins once the foreign proceeding is "recogni[zed]," *id.* § 1520(a), an event that Congress defined as simply "the entry of an order *granting* recognition," *id.* § 1502(7) (emphasis added). To state the obvious, orders that deny and orders that grant are not one and the same. Had Congress meant for "recognition" to also include the "entry of a[] [later reversed] order [denying] recognition," "it could have easily" defined "recognition" that way, *Connell v. Lima Corp.*, 988 F.3d 1089, 1099 (9th Cir. 2021). That "Congress did not write the statute" so broadly is "strong affirmative evidence" of our interpretation. *Id.* at 1099, 1108 (quoting *United States v. Naftalin*, 441 U.S. 768, 773 (1979)). Because our "function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written," *United States v. Great N. Ry. Co.*, 343 U.S. 562, 575 (1952), we conclude that only an order "granting" a petition for recognition triggers the automatic bankruptcy stay under a plain-text reading of Section 1520.

The Napoleonis ask us to use our equitable powers as a workaround to Section 1520's clear language. Their argument is simple: Because the BAP's decision in *In re Black Gold* reversed the bankruptcy court's March 15, 2021 order denying Black Gold's Chapter 15 petition, we should

hold that the automatic stay retroactively went into effect "as of th[at] date" because that is when the bankruptcy court "*should have* granted" Black Gold's petition.  A contrary ruling would "punish [the Napoleonis] simply because the [bankruptcy] court committed reversible error."

The Napoleonis' argument is foreclosed because they failed to move for a stay of the bankruptcy court's denial of Black Gold's Chapter 15 petition pending Black Gold's appeal to the BAP. Federal Rule of Bankruptcy Procedure 8007 allows "[a] party that disagrees with an order of a bankruptcy judge . . . [to] move to stay the order before that bankruptcy judge" or before the BAP "during the pendency of an appeal of the order." *In re Mortgs. Ltd.*, 771 F.3d 1211, 1215 (9th Cir. 2014) (citing pre-2014 version of the rule). Moving under Rule 8007 to stay an "objectionable order" that is pending review on appeal, we have explained, is less of a right and more of an "obligation" because a stay pursuant to Rule 8007 "protect[s] the rights of *all* parties in interest," not just the party who lost below. *Id.* at 1215, 1216 (emphasis added) (citation omitted). For the losing party, a stay under Rule 8007 of an order pending appeal ensures "that the estate and the status quo [will] be preserved" in the event that the order is later reversed. *Id.* at 1215 (quoting *In re Chateaugay Corp.*, 988 F.2d 322, 326 (2d Cir. 1993)). But just as important, for the prevailing party Rule 8007 allows the BAP or the bankruptcy court to "condition . . . the stay on [the] payment of a . . . bond or other security," which guarantees that the prevailing party will collect on its judgment if the order is ultimately affirmed. *Id.*; *see* Fed. R. Bankr. P. 8007(a)(1)(B), (c). "Our requirement that a party seek a stay of a bankruptcy court order with which it disagrees before appeal is [thus] grounded in important

principles of equity" that balance the interests of all parties. *In re Mortgs. Ltd.*, 771 F.3d at 1216.

Were we to excuse a losing party's failure to seek a stay of a bankruptcy court's order simply because that order is later reversed on appeal, then moving for relief under Rule 8007 would no longer be "obligatory." *See id.* at 1215 (quoting *In re Roberts Farms, Inc.*, 652 F.2d 793, 798 (9th Cir. 1981)). The party that lost below and appealed would already enjoy the protection that comes with a stay under Rule 8007 without any of the attendant burdens. He would benefit from the knowledge that—no matter what happened in the proceedings below during the pendency of his appeal—this Court would retroactively restore the status quo if he ultimately prevailed in front of a higher court. And if he lost on appeal, then at least he did not have to post a bond as a condition for obtaining a stay, as Rule 8007 contemplates.

The "inequitable results" that would follow from such an exception are no less difficult to imagine. *See id* at 1216. Without the benefit of a "bond or other security" that normally accompanies a Rule 8007 stay, there would be nothing to "protect[] the prevailing p[arty] from the risk of a later uncollectible judgment," *N.L.R.B. v. Westphal*, 859 F.2d 818, 819 (9th Cir. 1988) (per curiam). Especially in cases where "the chances of success" on appeal are "dim," the losing party would have every incentive to squander or conceal assets while his appeal remained pending. *See In re Mortgs. Ltd.* 771 F.3d at 1216 (citation omitted).

The Napoleonis, to be sure, attempt to explain their failure to move for a stay under Rule 8007, but their only excuse as to why they did not exercise this option is far from adequate. They argue that it would have been procedurally

impossible for them to move for a stay under Rule 8007 because they were not parties to Black Gold's Chapter 15 proceedings when the bankruptcy court ruled on Black Gold's petition. But the Napoleonis could have remedied this through a motion to intervene in Black Gold's Chapter 15 proceedings under Federal Rule of Bankruptcy Procedure 2018(a), which allows a bankruptcy court, on a motion and after a hearing, to "permit any interested entity" to join a bankruptcy proceeding "generally or with respect to any specified matter." So while the Napoleonis were not parties to Black Gold's Chapter 15 proceedings, they likely could have become parties had they only asked the bankruptcy court below.[4]

In future cases, an interested party who finds itself in the Napoleonis' position would do well to act "diligently" to intervene and stay an objectionable denial of a Chapter 15 petition that is pending appeal. *See In re Lomagno*, 429 F.3d at 18 (declining to restore "retroactively" the automatic bankruptcy stay, which terminated after the bankruptcy court erroneously dismissed a Chapter 13 petition, because the party failed to move promptly for a stay of the dismissal

---

[4] The Napoleonis had every reason to move to intervene in Black Gold's Chapter 15 proceedings under Rule 2018(a) and seek a stay of the bankruptcy court's denial of Black Gold's Chapter 15 proceedings under Rule 8007. As explained below, a stay of the bankruptcy court's denial order would have kept IPAC's separate enforcement-of-judgment action in district court on pause—at least until the BAP resolved the bankruptcy court's denial of Black Gold's Chapter 15 petition. That would have prevented IPAC from moving to add the Napoleonis as judgment debtors on an alter ego theory in the district court proceedings below. Important here, the Napoleonis were on notice that IPAC would likely attempt this procedural maneuver. Recall that IPAC had previously tried (but failed) to hold the Napoleonis personally liable for Black Gold's $1 million judgment in the arbitration proceedings. *Supra* note 2.

order); *see also In re Lashley*, 825 F.2d 362, 364 (11th Cir. 1987) (holding that "a debtor['s] [failure to] obtain a stay pending appeal of a bankruptcy court['s] . . . order" dismissing a Chapter 13 petition "renders moot any appeal" of subsequent acts that allegedly violate the automatic stay).

Had the Napoleonis done so here, the alleged errors that they complain of below in IPAC's enforcement-of-judgment action (all of which occurred *after* the bankruptcy court's denial of Black Gold's petition for recognition) likely never would have taken place. IPAC's action would have remained on pause until the BAP reversed the bankruptcy court's erroneous decision—because recall that the bankruptcy court provisionally stayed IPAC's action until Black Gold's Chapter 15 petition was definitively resolved. After that time, the automatic bankruptcy stay would have then taken effect and would have remained in place until Black Gold's insolvency proceedings in Monaco concluded. There would have been no opportunity for the district court below to draw adverse inferences against Black Gold for its discovery misconduct, and thus no basis to add the Napoleonis as judgment debtors or to order them to pay IPAC's attorneys' fees. As a result of their failure to intervene and seek a stay, the Napoleonis "permit[ted] [these] developments to proceed" through their "own inaction." *In re Mortgs. Ltd.*, 771 F.3d at 1217 (first alteration in original) (quoting *In re Thorpe Insulation Co.*, 677 F.3d 869, 881 (9th Cir. 2012)).

\* \* \*

The bankruptcy court's denial of Black Gold's Chapter 15 petition was not an order "granting" recognition of the Monaco proceedings necessary to trigger the automatic bankruptcy stay. And even if it fell within our equitable powers to backdate retroactively the BAP's reversal of the

bankruptcy court's denial order in *In re Black Gold*—a question we need not answer today—we would not exercise it here where the interested party failed to move for a stay of the bankruptcy court's erroneous denial. The events that transpired in IPAC's enforcement action in the district court are thus not void for violating any automatic stay. We turn now to the second point of contention in this case.

**B**

The Napoleonis next argue that IPAC's alter ego claim belongs to Black Gold's trustee, not IPAC, because it is a "general" alter ego claim that alleges harm against Black Gold's creditors as a group, not IPAC as an individual creditor. The Napoleonis therefore ask us to hold that, for the purposes of the automatic bankruptcy stay currently in effect, IPAC's alter ego claim is the "property" of Black Gold's estate that only Black Gold's trustee may pursue.

"[S]tate law determines whether a claim belongs to the trustee or to the creditor." *Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1250 (9th Cir. 2010). That, in turn, invites another question in need of an answer: What state law governs whether IPAC's alter ego claim belongs to IPAC or Black Gold's trustee?

The Napoleonis do not address this choice-of-law issue, while IPAC observes only that Black Gold's bankruptcy proceedings are in Monaco, which "logically suggests" that Monegasque law determines whether its alter ego claim belongs to Black Gold's trustee. But neither Black Gold nor the Napoleonis offered "any such Monegasque law" on that question in the proceedings below, IPAC continues, even though Federal Rule of Civil Procedure 44.1 would have required them to. Fed. R. Civ. P. 44.1 ("A party who intends to raise an issue about a foreign country's law must give

notice by a pleading or other writing."). For that oversight, IPAC asks us to treat Appellants' failure to give Rule 44.1 notice as "a dispositive point in [IPAC's] favor."

While not in the sense that IPAC may mean, Appellants' failure to give Rule 44.1 notice is "dispositive" insofar as it resolves the choice-of-law issue just discussed. "The appropriate reading . . . of Rule 44.1" is that a party forfeits "the right to rely on foreign law if [he does not] supply the information needed to determine it." *G & G Prods. LLC v. Rusic*, 902 F.3d 940, 949 (9th Cir. 2018) (citation omitted). He therefore "acquiesce[s] [to] the application of the law of the forum." *Id.* at 950 (quoting *Interpool Ltd. v. Char Yigh Marine (Pan.) S.A.*, 890 F.2d 1453, 1458 (9th Cir. 1989)). Because Appellants did not give Rule 44.1 notice to the district court below that an alter ego claim against a debtor corporation's sole owners is the exclusive "property" of the corporate debtor's bankruptcy trustee under Monagasque law, Appellants forfeited any such argument here. *See id.* That leaves California, the forum state, as the "presumptively controlling" source of law on that question. *Id.* at 949 (citation omitted).

We have already answered the question as to who owns an alter ego claim under California law in *Ahcom*—a case that, on the facts, is a near spitten image of this one. After winning in arbitration against Nuttery Farms, Inc. for its failure to deliver on some contracted-for almonds, Ahcom sued in state court to collect its award, and the action was removed to the Northern District of California. 623 F.3d at 1249. But rather than seek recovery from Nuttery Farms—which declared bankruptcy shortly after losing in arbitration—Ahcom named Nuttery Farms' joint owners, the Smedings, as the sole judgment-debtors in the enforcement action. *Id.* While Ahcom's complaint asserted the

"substantive claim[]" that Nuttery Farms breached its contract with Ahcom, the complaint alleged that the Smedings were liable for Nuttery Farms' wrongdoing through the "procedural claim" that they were Nuttery Farms' alter ego. *Id.* at 1249, 1250.

The Smedings moved to dismiss. *Id.* at 1249. Like the Napoleonis argue here with respect to IPAC's alter ego claim, the Smedings argued that Ahcom's claim was a "general alter ego" claim that depended on factual allegations about the "general conduct [by the Smedings] that harmed all creditors." *Id.* at 1250–51. It was therefore "exclusively the property of [Nuttery's] trustee," the Smedings argued, and the district court agreed, dismissing Ahcom's complaint for failure to state a claim. *Id.* at 1249–50.

We reversed. The "crucial problem" with the Smeding's argument was that, under California law (which the parties agreed applied) a "general" alter ego claim was a "made-up cause of action" that simply "d[id] not exist" in that state. *Id.* at 1250–52. To the extent a trustee had authority to bring an alter ego claim against a corporate debtor's sole owners, California courts required "some allegation of injury to the corporation" *itself* that "giv[es] rise to a right of action" *held by the corporation* against the sole owners. *Id.* at 1251 (emphasis omitted) (quoting *Stodd v. Goldberger*, 73 Cal. App. 3d 827, 833 (1977)); *id.* at 1252 (citing examples, such as "fraudulent conveyance," "conversion" of corporate assets, or "theft"). "In the absence of any such allegation, the asserted cause of action belong[ed] to [the] creditor individually," and the alter ego claim along with it. *Stodd*, 73 Cal. App. 3d at 833. But there was "no such thing" in California as the right of a trustee to assert an alter ego claim against a corporation's owners on behalf of all creditors.

*Ahcom*, 623 F.3d at 1251; *id.* at 1252 ("*Stodd* teaches that a trustee 'is not an appropriate general representative of creditors.'" (quoting *Stodd*, 73 Cal. App. 3d at 835)).

Applying these principles here, the outcome is the same as it was in *Ahcom*. There is still "no such thing" as a general alter ego claim in California. *Id.* at 1251; *see Favila v. Pasquarella*, 65 Cal. App. 5th 934, 946 (2021). And all of IPAC's substantive causes of action—breach of contract, trade secret misappropriation, and the rest—allege injury to IPAC, not to Black Gold. *See Ahcom*, 623 F.3d at 1249. IPAC's alter ego claim against the Napoleonis is thus "merely . . . a procedural mechanism" through which IPAC seeks to "h[old] [the Napoleonis] jointly liable for the wrongdoing" of Black Gold. *See Double Bogey, L.P. v. Enea*, 794 F.3d 1047, 1051–52 (9th Cir. 2015) (citing *Ahcom*, 623 F.3d at 1251). To the extent this purely procedural claim belongs to anyone, it belongs to IPAC. *See Stodd*, 73 Cal. App. 3d at 833.

## C

Aside from the "property of the debtor," the automatic bankruptcy stay also applies to "the debtor" himself, whom Chapter 15 defines as "[the] entity that is the subject of [the] foreign [bankruptcy] proceeding." 11 U.S.C. § 1502(1). The Napoleonis all but concede that they fall far short of meeting this statutory definition because it is Black Gold, not they, who declared bankruptcy in Monaco. And they acknowledge further that it is "the general rule" in this Circuit "that the automatic stay does not apply to actions against non-debtors," which is what the Napoleonis are. *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1096 (9th Cir. 2007)*; cf. Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2081 (2024) (holding corporate debtor's sole-owner, as non-

debtor in underlying bankruptcy proceedings, was not entitled to bankruptcy protection of a discharge of liability to a non-consenting creditor). Relying on the Fourth Circuit's decision in *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986), the Napoleonis urge us instead to create an exception to this rule in the "unusual situation" where "there is such identity between the debtor and the [non-debtor] . . . that a judgment against the [non-debtor] will in effect be a judgment or finding against the debtor." *Matter of Lockard*, 884 F.2d 1171, 1179 (9th Cir. 1989) (quoting *A.H. Robins Co.*, 788 F.2d at 999). After all, if it is true that the Napoleonis are Black Gold's alter ego, the Napoleonis explain, then the Napoleonis and Black Gold are "one and the same entity" and IPAC's enforcement-of-judgment action against the Napoleonis is, in essence, really just an action against Black Gold.

We have declined to adopt the Fourth Circuit's "unusual situation" exception on several occasions. *In re Excel Innovations, Inc.*, 502 F.3d at 1098; *In re Chugach Forest Prods., Inc.*, 23 F.3d 241, 246–47 (9th Cir. 1994); *United States v. Dos Cabezas Corp.*, 995 F.2d 1486, 1491 n.3 (9th Cir. 1993); *Matter of Lockard*, 884 F.2d at 1179. While our reasons for refusing have varied from case to case, the "vitality" of the Fourth Circuit's "unusual situation" exception has, in this Circuit, remained "[un]clear." *In re Chugach*, 23 F.3d at 247. Here again we find good reason to defer that question for a future case.

"Even if" we wanted to adopt the *A.H. Robins* exception, the bankruptcy court in the Chapter 15 proceedings below "first need[ed] to [decide whether] to extend the automatic stay" to the Napoleonis "after [a] hearing" and a finding of an "unusual need" to "take this action to protect" Black Gold's estate. *Id.* at 247 n.6 (quoting *Patton v. Bearden*, 8

F.3d 343, 349 (6th Cir. 1993)). That is because the *A.H. Robins* "unusual situation" exception—"although referred to as [an] extension[] of the automatic stay"—is rooted in the bankruptcy court's "injunctive powers under section 105" of the Bankruptcy Code. *Id.* (quoting *Bearden*, 8 F.3d at 349; *In re Advanced Ribbons & Office Prods., Inc.*, 125 B.R. 259, 266 (9th Cir. BAP 1991)). Because the bankruptcy court was not asked to answer these questions in the first instance, this case is not in the correct procedural posture for us to decide whether to adopt *A.H. Robins* as the law in this Circuit. Thus, "we again postpone resolution of th[is] issue until another day." *Id.* at 247.

## IV

No automatic bankruptcy stay was in place when the district court drew adverse factual inferences against Black Gold for its discovery misconduct and later relied on those inferences to find the Napoleonis jointly liable for IPAC's judgment. And while there is, of course, an automatic bankruptcy stay currently in effect with respect to Black Gold, it does not extend to the Napoleonis—who are not "debtors" in the Monaco insolvency proceedings—nor to IPAC's alter ego claim against the Napoleonis—which is not the "property" of Black Gold's estate under California law. We therefore affirm the district court's final judgment below and its subsequent award of attorneys' fees and costs.

**AFFIRMED.**